*In re* MARRIAGE OF COLLEEN DAVIS, Petitioner-Appellee, and LYNN DAVIS, Respondent-Appellant.

Fourth District   No. 4—91—0624

Opinion filed June 4, 1992.—Rehearing denied July 14, 1992.

Record, Finney, Jankowicz & Morthland, of Decatur, for appellant.

Jessica Stricklin, of Decatur, for appellee.

JUSTICE LUND delivered the opinion of the court:

Petitioner Colleen Davis Sample filed a petition in the circuit court of Macon County, asking for permission to remove the parties' minor child Melissa to the State of Georgia. Her former husband, respondent Lynn Davis, objected, and a hearing was held on the petition. The trial court granted the petition and modified respondent's visitation with Melissa. His motions for reconsideration and to vacate the judgment were denied, and he now appeals.

Petitioner and respondent were divorced in 1989. They have three minor children, Patrick, Matthew, and Melissa. At the time of the hearing on the petition to remove, Patrick was 14 years old, Matthew was 13, and Melissa was 6. Custody of all three children was awarded to petitioner, subject to respondent's visitation.

In May 1990, the parties entered into a stipulation whereby custody of Patrick and Matthew was transferred to respondent, subject to petitioner's right of reasonable visitation. Melissa continued to reside with petitioner. Respondent's child-support obligation was terminated by agreement. In June 1990, respondent filed a petition for adjudication of civil contempt, charging petitioner had denied him visitation with Melissa. He also filed a petition to modify the judgment of dissolution, asking for additional visitation with Melissa in order to allow her to spend more time with her brothers. In August 1990, the trial court entered an order granting respondent additional visitation with Melissa. Visitation was granted on alternating weekends, for half of Melissa's Christmas school vacation and half of the Easter school vacation, alternating holidays and alternating birthdays, a half day during each week, and three weeks during the summer. This was respondent's visitation schedule at the time of the hearing on petitioner's petition to remove. The modification order also provided that respondent would be allowed to make phone calls to Melissa. However, he was ordered not to harass petitioner or make disparaging remarks to Melissa during the phone calls. The trial court made no findings with respect to respondent's petition for contempt, and the record contains no order disposing of that petition.

In April 1991, petitioner filed her petition to remove Melissa to Georgia, alleging that she was engaged to be married, her prospective husband was employed in Georgia, and he had rented a house there with an option to purchase it. She further alleged she was a licensed practical nurse (LPN) and had arranged for job interviews in Georgia. In count II of the petition, petitioner asked for modification of the judgment of dissolution of marriage, changing the visitation of both parties with the minor children to accommodate her proposed move to Georgia. She proposed that she have visitation with Patrick and Matthew for the first half of the summer and, at the end of that period, Melissa would return to Illinois with the boys for visitation with respondent. Melissa would remain in Illinois until the end of her summer vacation from school. Petitioner proposed that respondent pay for Melissa's transportation to Illinois and back to Georgia, and that petitioner pay for the boys' transportation to Georgia and their return to Illinois. Petitioner also proposed continuing to split the children's Christmas vacations, with the children to be together during these periods.

Respondent filed no formal response to the petition. However, at the hearing on the petition on May 1, 1991, it was clear that respondent objected to the removal of Melissa from Illinois.

Petitioner testified at the hearing that she resided in Argenta, Illinois, and worked at a pharmacy as a technician. She has an LPN license; however, this was not required in her current employment. She earned $7.75 per hour for 40 hours per week. She and Melissa lived in a three-bedroom house, which she owned subject to a mortgage. She had been dating her fiance Allen Sample for 18 months and had been engaged to him for six months. Their wedding date was June 29, 1991. If allowed to take Melissa to Georgia, they would be moving in July. Sample had rented a three-bedroom house in Washington, Georgia, with an option to purchase. It was comparable to the house she and Melissa had in Argenta. Melissa would have her own bedroom. The house was on four acres of land located in a rural area. There was a public and private school there. Melissa would be in first grade when the new school year began. Petitioner had interviewed for a position in Augusta, Georgia, where she could work full-time as an LPN. Since Augusta was an hour's drive from Washington, however, she would prefer to work in Washington, where she had interviewed for two jobs. She could work at either place as an LPN. At Wills Memorial Hospital (Wills Memorial), she would be making $8 to $8.50 per hour, with hours from 3 p.m. to 11 p.m., either full-time or part-time four days per week. Petitioner testified she might take a part-time position so that she could be home more with Melissa. At Washington Dialysis Facility, Inc. (Washington Dialysis), her hours would be 7 a.m. to 5 p.m., and her salary would be at $9 per hour, with increases at three months and again at six months. To substantiate these statements, petitioner produced letters from the two prospective employers. They were admitted into evidence without objection from respondent. The letter from Wills Memorial, signed by the director of nursing, stated petitioner had been interviewed for an LPN position and that the director would offer her a position there, pending reference checks and petitioner's license application to the Georgia Board of Nursing. The letter stated the salary would be $8.50 to $8.75 per hour, with shift differentials available. The letter further stated there were two positions open: full-time Monday through Friday 3 p.m. to 11 p.m., and part-time every other weekend from 7 a.m. to 7 p.m. The letter from Washington Dialysis merely stated petitioner had completed an application for an LPN position there and that she was being considered for this position if it was still open in July.

Upon cross-examination, petitioner admitted that there was a period of time after the boys went to live with respondent that she denied him visitation with Melissa. If she worked the 3 to 11 p.m. shift,

Allen would watch Melissa during her work hours, or she would hire a baby-sitter until Allen returned home from work. She worked from 9 a.m. to 5 p.m. at her present job. Melissa stayed with a baby-sitter in Argenta, except that she was with her father on Wednesday mornings. Petitioner testified she could find work as an LPN in Decatur if she wanted, but she did not know what she would be paid. When she worked for a hospital three years ago, she made $7.10 per hour. She had worked as an LPN in Mt. Zion at a nursing home making $7.75 per hour and in a doctor's office for $7.75 per hour. She was fired from the job at the doctor's office because of her job performance.

Petitioner also testified that since the divorce there had been some problems with comments respondent had made to the children about her. Respondent had at times been hostile and verbally aggressive with her, and she had at times reciprocated. She stated that she had no intention of trying to sever respondent's relationship with Melissa.

Allen Sample testified that he had resided in Washington, Georgia, for approximately 90 days. He was a shop foreman at Gunter Well Drilling and Boring, an automobile restoration garage, working 40 hours per week. As long as he worked eight hours per day, he can set his own hours. He had lived in Georgia for seven or eight months. He had previously been employed in Decatur at Jenkins Automotive. He was laid off there before moving to Georgia. He was making more money at the shop in Georgia than he was in Decatur. Sample testified that he had never had a job that paid as much as his job in Georgia. He said he gets along well with Melissa.

Sample testified on cross-examination that his take-home pay is $500 per week; however, he did not have any pay stubs to substantiate this testimony. He was unemployed at the time he went to Georgia. He stayed with his brother for several months and, when he was hired for his current job, he decided to make a permanent move to Georgia. His gross income at his prior job in Decatur was $490 per week.

The trial court interviewed the three minor children *in camera*. Melissa said she did not want to move to Georgia because she would miss her friends. She liked the house in Georgia "a little bit." She liked Sample. When reminded of her brothers, Melissa stated she would miss them, too. They play together, and she was pretty close to them.

Patrick stated that he did not want his mother to remarry and did not want her to move to Georgia. He did not, however, think his parents should get back together. He would not want to spend half the

summer in Georgia because of his friends in Illinois, but a couple of weeks would be okay. The reason he and his brother went to live with his father was that he had a physical confrontation with his mother and she kicked him out of her house. The problem with Matthew was that he was arguing with his mother. However, there have been no problems between him and his mother since that incident. He visited her often and gets along with her. He felt very close to Melissa, liked having her around, and did not want her to move.

Matthew Davis said he did not like Sample. His father did not like Sample, but he had not said anything to Matthew about it. He himself had had no problems with Sample. When asked if he had any objection to his mother starting a new life in Georgia, Matthew said if she did she would be leaving him, his brother, and his sister out because of the move. He did not want to ever go to Georgia. His relationship with Melissa was "very great." He played house with her.

Florian Davis, mother of respondent, testified that she resided in Decatur and was Melissa's only living grandparent. She saw Melissa most weekends respondent had her for visitation.

Respondent Lynn Davis testified that he had a close relationship with Melissa. He was laid off from his job from February 1985 to January 1989. When Melissa was born he was her primary care giver for the first 18 months of her life, while his wife worked. In describing his relationship with Melissa at the present time, respondent testified, "I love her dearly and she loves me dearly. There is, I can't say another word about it. Just plain and simple." He stated that Melissa had a loving relationship with her brothers and that the boys were with her all the time when he has her for visitation. They played with the animals on his farm, they played ball together, and they swam at a swim club. He would be willing for Melissa to live with him if petitioner's request to move is denied.

Allen Sample was called to testify by respondent's counsel. He testified that he was in arrears in child support for his own children. He stated that he was in contact with his former wife and she knew he would pay the arrearage. He was paying his current support obligation, and there were no problems between him and his former wife.

At the conclusion of the hearing, the trial court found (1) petitioner intends to remarry; (2) her future husband is employed and lives in Georgia; (3) it is in Melissa's best interest to remain in the custody of petitioner; (4) petitioner has substantial employment possibilities in Georgia; and (5) "[t]his is a common problem due to our mobile society and it is a compelling reason for granting the petition."

Petitioner was granted permission to remove Melissa to Georgia, on the condition that she marry Sample prior to moving.

After a further hearing on the issue of modification of visitation, the trial court entered an order on June 14, 1991, granting respondent visitation with Melissa during the month of July each year. Petitioner was granted visitation with Patrick and Matthew during June of each year. The parties were each to have the children for half of their Christmas school vacations. Respondent was ordered to bear the expense of transporting the children to Illinois, and petitioner was required to pay the expense of transporting them to Georgia.

Respondent filed a motion asking for reconsideration of the trial court's order or a reopening of proceedings to permit additional evidence concerning petitioner's motive in seeking the removal of Melissa from Illinois. He also filed a motion to vacate the trial court's order, claiming Sample had fabricated or exaggerated his claim of employment in Georgia. Respondent's counsel filed an affidavit stating that he had telephone contact with personnel at Sample's place of employment in Georgia on June 7, 1991, and had been told that Sample had not been there for several weeks. Counsel's affidavit stated he was told that Sample "just piddled around" and worked on automobiles, but that he was not a foreman or supervisor.

Petitioner filed a response to this last motion, asking that respondent's motions and affidavit be stricken. Her response included an affidavit of Perry Gunter, Sample's employer, detailing his employment arrangement with Sample. That affidavit stated that Sample works for Gunter as an independent contractor, repairing and restoring antique automobiles. Sample is responsible for paying his own taxes, he sets his own hours, and he is in charge of his portion of the shop when he is working. The affidavit further stated that Sample had permission to be absent from work for substantial periods of time during May and June 1991 in order to attend court hearings in connection with the instant case and for other personal matters. It also stated that Sample was expected to return to work for Gunter as soon as he was able to settle his personal affairs.

The trial court denied respondent's post-trial motions. Notice of appeal was then filed by respondent. We note the record indicates petitioner and Sample were married prior to this appeal.

On appeal, respondent contends the trial court's decision allowing petitioner to remove Melissa to Georgia was against the manifest weight of the evidence. We agree and reverse.

Removal of a child from the State by a custodial parent is governed by section 609 of the Illinois Marriage and Dissolution of Mar-

riage Act (Act) (Ill. Rev. Stat. 1989, ch. 40, par. 609). Subsection (a) reads as follows:

"The court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal. When such removal is permitted, the court may require the party removing such child or children from Illinois to give reasonable security guaranteeing the return of such children." Ill. Rev. Stat. 1989, ch. 40, par. 609(a).

In removal cases, the paramount question is whether the move is in the best interest of the child. As stated by section 609(a) of the Act, the burden is on the custodial parent to show that removal of the child from the State is in the best interest of the child. While such cases must be judged on their own unique set of facts (*In re Marriage of Berk* (1991), 215 Ill. App. 3d 459, 463, 574 N.E.2d 1364, 1367, *appeal denied* (1991), 141 Ill. 2d 536, 580 N.E.2d 108), our supreme court has provided some guidance to the courts of this State in deciding these cases. In *In re Marriage of Eckert* (1988), 119 Ill. 2d 316, 518 N.E.2d 1041, the court identified five factors which should be considered in determining whether removal is in the best interest of the child or children sought to be removed. Those factors are: (1) the likelihood for enhancing the general quality of life for both the custodial parent and the children; (2) the motives of the custodial parent in seeking the move; (3) the motives of the noncustodial parent in resisting the removal; (4) the visitation rights of the noncustodial parent; and (5) whether a realistic and reasonable visitation schedule can be reached if the move is allowed. (*Eckert*, 119 Ill. 2d at 326-27, 518 N.E.2d at 1045-46.) In addition, courts should be guided by the policy of the Act as expressed in section 102(7), which states that one of the underlying purposes of the Act is to "secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children during and after the litigation." Ill. Rev. Stat. 1989, ch. 40, par. 102(7).

In applying the above factors to the evidence adduced in the instant case, we are mindful that the trial court's decision is not to be disturbed unless it is clear its decision was against the manifest weight of the evidence and that a manifest injustice has occurred. (*Eckert*, 119 Ill. 2d at 328, 518 N.E.2d at 1046.) Although the trial court has broad discretion in these cases, that discretion is not unlim-

ited and, when the decision is against the manifest weight of the evidence, it will be reversed. *In re Marriage of Bush* (1988), 170 Ill. App. 3d 523, 529, 525 N.E.2d 163, 166.

The only factor we need not discuss concerns respondent's motives in resisting Melissa's removal from Illinois. There was no evidence before the trial court bearing on his motives in objecting to the removal. Therefore, we will proceed to discuss the four other factors.

■ As to the question of enhancement of quality of life for petitioner and Melissa, we first note that a mere desire to move to another State, without more, is insufficient to show the move to be in the best interest of the child. (*In re Marriage of Stone* (1990), 201 Ill. App. 3d 238, 243, 559 N.E.2d 92, 95.) The trial court found that petitioner intended to remarry and that her future husband lives and works in Georgia. Quite naturally, petitioner wishes to move to Georgia to be with her new husband. However, simply because she would be happier living with him in Georgia than living without him in Illinois does not in itself establish that the quality of Melissa's life would be enhanced by a move to Georgia. We agree with the court in *Berk*, when it observed:

> "It is virtually impossible to envision a situation wherein the custodial parent does not wish to live with a new spouse. If the obvious happiness the spouse would receive from being able to live with a new spouse were sufficient to prove removal in the child's best interests, court supervision of the proceedings would be unnecessary, and at best, ceremonial. A custodial parent must prove more than his or her own desire to live with a new spouse to prove that a child's best interests will be served by removal." *Berk*, 215 Ill. App. 3d at 466, 574 N.E.2d at 1369.

However, a court should not confine its consideration only to the direct benefits a child may receive from removal. A child may also receive indirect benefits from a proposed move (*In re Marriage of Carlson* (1991), 216 Ill. App. 3d 1077, 1081, 576 N.E.2d 578, 580, *appeal denied* (1991), 142 Ill. 2d 652, 584 N.E.2d 127), and such benefits should be considered where they are established by the evidence. In the instant case, the evidence was that petitioner intended to marry Allen Sample, who lived and worked in Georgia. She wished to move to Georgia and take Melissa with her. The house in Georgia is comparable to the house owned by petitioner in Argenta and in which she and Melissa resided at the time of the hearing. Petitioner attempted to show a financial benefit to herself and Melissa through testimony regarding Sample's income and her own job prospects in Georgia. While we do not dispute that the added income of petitioner's new

husband would bestow a financial benefit on Melissa in the form of an increased standard of living, such a benefit is one which would occur in almost every remarriage where a second income is added to the family. This fact alone is not determinative. *Berk*, 215 Ill. App. 3d at 467, 574 N.E.2d at 1369.

Allen Sample testified he made more money in Georgia than he had ever made in Decatur at previous jobs. However, the evidence showed that he had weekly gross income of $490 at his job in Decatur and gross income of $500 per week at his current job in Georgia. This evidence does not support his claim of enhanced income. In addition, there was no showing that Sample was unable to find suitable employment in Decatur after being laid off from his job at Jenkins Automotive.

Petitioner testified she wished to secure a job as an LPN in Georgia, and she testified as to two job possibilities. The trial court found that she had "substantial" employment prospects in Georgia. Petitioner was allowed to introduce letters from prospective employers into evidence. These letters, although hearsay, were not objected to by respondent's counsel. However, the employment possibilities mentioned in these letters were clearly contingent upon certain conditions, some of which were beyond petitioner's control. The job at Wills Memorial was contingent upon reference checks and petitioner obtaining her LPN license in Georgia. Petitioner's admitted discharge from previous employment as an LPN for poor job performance would certainly have a bearing on the kind of references she would be given. The letter from Washington Dialysis merely stated petitioner had applied for an LPN position and that she would be considered for that position if it was still open after her anticipated move to Georgia in July. These job prospects could hardly be termed "substantial."

Further, petitioner admitted that she could obtain an LPN position in Decatur if she wished to. While her prospective job opportunities in Georgia may pay more than her pharmacy job in Illinois, it was apparent from her testimony that she had not sought employment as an LPN in Illinois. When questioned, she had no current information as to how much she might expect to earn as an LPN in Decatur at the time of the hearing on her petition for removal. Her only testimony on this fact was as to what she had earned as an LPN at a hospital three years previously.

Another factor petitioner relies on to support the trial court's decision is her testimony that she would be able to spend more time with Melissa in Georgia than she had been able to in Illinois. She testified that she might take part-time work in order to do this. If peti-

tioner were able to spend more time with Melissa, this would undoubtedly confer a substantial benefit on Melissa which would merit careful consideration. However, petitioner's testimony concerning her job prospects casts serious doubt upon her ability to accomplish this. The only evidence of part-time employment was at Wills Memorial, where a position was available working every other weekend. Taking this job would significantly reduce petitioner's income, thus weakening her argument that Melissa would have an increased standard of living in Georgia. The other position at Wills Memorial and the position at Washington Dialysis were full-time positions. Moreover, the full-time position at Wills Memorial would require petitioner to work from 3 p.m. to 11 p.m. This would mean she would actually be able to spend considerably less time with Melissa than she could working her present hours in her current job at the pharmacy in Decatur.

We note petitioner testified that both a private school and public school were available for Melissa to attend. However, no evidence was presented as to the quality of education Melissa would receive compared to the quality of the school she was attending in Argenta.

Given the evidence, we cannot say the general quality of Melissa's life would likely be enhanced by the proposed move to Georgia. At most, the impact of a move to Georgia on Melissa, without consideration of the other *Eckert* factors, would likely be neutral.

■ We next consider the question of petitioner's motives in seeking removal of Melissa to Georgia. Respondent tried to show that petitioner had previously interfered with his visitation with Melissa. She did admit in her testimony that she had denied respondent visitation with his daughter shortly after custody of the two boys was transferred to him. However, we note this took place a year prior to the filing of the petition for removal. There have apparently been no visitation problems since that time. We also note that petitioner testified respondent had been hostile and verbally aggressive toward her at times. Further, the order entered by the trial court in August 1990, modifying respondent's visitation with Melissa, required him to refrain from harassing petitioner when he made phone calls to Melissa. While we would not condone any alleged attempt to defeat respondent's visitation, the evidence on balance tends to show that both parties may bear some responsibility for whatever visitation problems may have arisen in 1990. We do not consider them significant for purposes of our decision here.

■ We will now consider the last two factors. Those factors involve the effect on respondent's visitation rights of the proposed

move and whether a realistic and reasonable visitation schedule can be achieved if the move is allowed.

It is in the best interest of a child to have a close and healthy relationship with both parents and with other family members as well. Accordingly, when a noncustodial parent has diligently exercised visitation rights, a court should be reluctant to interfere with those rights by permitting removal of a child for frivolous or inadequate reasons. *Eckert*, 119 Ill. 2d at 327, 518 N.E.2d at 1045-46.

Respondent testified that he and his daughter are very close. He was her primary care giver for a period of time after her birth. Unfortunately, the evidence was somewhat lacking as to details of their current relationship. However, we note it was petitioner's burden of proof to show the move to be in Melissa's best interest. She provided no evidence suggesting respondent has not exercised his visitation rights or that he does not enjoy a close relationship with Melissa. Petitioner's testimony did not contradict respondent's statements as to this relationship, nor did her counsel challenge respondent's testimony on cross-examination. In addition, Melissa has two brothers with whom she does not currently live. She sees them only when she visits her father or when her brothers visit petitioner. Both boys testified *in camera* that they feel close to Melissa and they were very emphatic that they did not want her to move to Georgia. They indicated, as did respondent in his testimony, that they play together when Melissa comes to visit and that they get along well together. Melissa indicated in her testimony that she did not want to move. Her primary reason seemed to be that she would miss her friends. Melissa's paternal grandmother testified that she sees Melissa on most weekends that her father has visitation with her. She is Melissa's only living grandparent. Melissa has no family living in Georgia.

The trial court, in a separate proceeding after the hearing on the petition for removal, modified respondent's visitation to accommodate petitioner's move to Georgia. Respondent lost all his weekend visitation, his holiday and birthday visitation (with the exception of a few days at Christmas), and his Wednesday visitation. In return, he received one month's visitation in the summer and one half the Christmas school vacation. This represents an approximate 35% reduction in respondent's visitation with Melissa. In addition, Melissa will be deprived of regular contact with her brothers, even though the total number of days with them under the proposed visitation schedule will not be greatly reduced. A reasonable visitation schedule is one that will preserve and foster a child's relationship with the noncustodial parent. (*In re Marriage of Gratz* (1989), 193 Ill. App. 3d 142, 149,

548 N.E.2d 1325, 1329.) Where, as here, a noncustodial parent has exercised his visitation rights, we cannot say that a 35% reduction in visitation is reasonable where there has been an inadequate showing by the custodial parent that the move will enhance the quality of the child's life.

The evidence placed before the trial court by petitioner in support of her desired move really boils down to her desire to move to Georgia to be with her new husband. As we have stated previously, if this was the only requirement to show the move to be in the best interest of the child, there would have been little reason for the legislature to enact section 609 of the Act. As was stated in *Eckert*, much more than this is required. Although ours is indeed a mobile society, this fact alone is not, contrary to the findings of the trial court, a compelling reason to grant a custodial parent's petition for removal. Custodial parents and their spouses do not make decisions in a vacuum. Decisions must be made in an environment in which the best interest of the child is paramount. (*Berk*, 215 Ill. App. 3d at 465, 574 N.E.2d at 1368.) Petitioner here did not carry her burden of proof. Therefore, the decision of the trial court granting her petition for removal and modifying visitation must be reversed.

Reversed.

GREEN, P.J., and KNECHT, J., concur.