SHERRI TYSL, n/k/a Sherri Visnaw, Petitioner-Appellee, v. CHRISTOPHER LEVINE, Respondent-Appellant.

Second District   No. 2—95—0803

Opinion filed March 15, 1996.

Maureen H. Flaherty, of Lehrer, Flaherty & Canavan, of Wheaton, for appellant.

Douglas P. Trent and Connie J. Butcher, of Law Offices of Trent & Butcher, of Carol Stream, for appellee.

JUSTICE RATHJE delivered the opinion of the court:

Respondent, Christopher Levine, appeals from the trial court's judgment granting petitioner's, Sherri Tysl's, petition to remove their child, Kathryn, from Illinois.

The parties were never married. Kathryn was born on May 18, 1986. Initially, petitioner and Kathryn lived with the respondent at his Wheaton, Illinois, residence. Approximately 1 1/2 years later, respondent moved out of this residence to live with his parents. Petitioner and Kathryn continued to live at the residence for approximately six months and then moved to an apartment in Glendale Heights. After this move, respondent returned to live in his Wheaton home.

On January 5, 1990, a judgment of paternity and joint legal

custody was entered, along with a joint parenting agreement. On July 1, 1994, petitioner and Kathryn moved from Glendale Heights to Aurora. Petitioner married Michael Visnaw (Michael) on December 30, 1994. At that time, Michael worked and resided in Georgia. On February 1, 1995, petitioner was given leave to file her petition to remove Kathryn from the State. After a hearing late in April 1995, the trial court granted petitioner's petition. On June 16, 1995, an agreed order relating to visitation, support payments, and attorney fees was entered. The agreed order provided, *inter alia*, that respondent's visitation with Kathryn would amount to approximately 70 days annually. This timely appeal followed.

Respondent raises one issue before this court, namely, that the trial court's decision to grant the petition was against the manifest weight of the evidence.

We initially address respondent's motion to strike portions of petitioner's brief, which is being taken with the case. Respondent argues that, in her brief, petitioner improperly refers to the agreed order entered on June 16, 1995, as a basis upon which to affirm the trial court's judgment. We agree with respondent that the agreed order was entered a number of weeks after the trial court granted the petition and that it played no part in its determination of this cause. Accordingly, we grant respondent's motion to strike the relevant portions of petitioner's brief.

## PETITIONER'S CASE

At the hearing on the petition, petitioner testified that she was 34 years old and had been living with Kathryn in an Aurora, Illinois, apartment since July 1, 1994. Prior to that, they had lived in a Glendale Heights apartment since 1988. Petitioner was employed as a secretary at Merchants Home Delivery (Merchants) and was earning $27,000 annually. Petitioner met her husband, Michael, in 1990; they were married on December 30, 1994. Michael worked for Merchants as an account executive, specializing in transportation delivery services. In mid-1994, Michael's sole Illinois account was closed, and he was transferred by Merchants from Illinois to Atlanta, Georgia. Petitioner testified that, since being transferred, Michael had flown back to visit every few months.

Petitioner and Michael had not leased an apartment in Georgia, due to uncertainty related to the petition. Petitioner testified that she did not plan to obtain a job immediately upon moving to Georgia; she hoped to work on a part-time basis. Petitioner stated that respondent had reduced his child-support payments from $110 per week to $100 per week without court order. At the time of the hearing, re-

spondent owed $1,580 in child support. Petitioner also testified that respondent did not provide medical insurance for Kathryn.

On cross-examination, petitioner conceded that Kathryn stayed at respondent's home three nights a week. Kathryn saw petitioner's parents approximately every two weeks. Petitioner testified that she did some research on Atlanta-area school districts. She concluded that these school districts were "about even" with the Naperville school (District 204) in which Kathryn was enrolled.

On redirect examination, petitioner stated that Michael had unsuccessfully attempted to find other work with Merchants in Illinois. Michael also looked for Merchants' jobs located closer to Illinois but could not find any. Neither petitioner nor Michael wanted to move to Georgia.

Michael testified that he retired from the Air Force in 1987, after 20 years' service. Since that time, he had worked for Merchants in a number of locations. While working for Merchants in Illinois, Michael worked exclusively on the Montgomery Ward account, which was terminated late in June 1994. Michael asked Merchants if there were any job openings in Illinois; he was told there were no positions available. He stated that he would prefer to live in Illinois. Michael went to Atlanta on July 5, 1994, to work on a temporary Merchants' assignment. His salary was $60,000 per year with a $500-a-month car allowance. He also received $13,000 per year in military retirement payments.

Michael's marriage to petitioner was his third. He stated that he had three children, ages 26, 23, and 19, from his first marriage, and one child, age 13, from his second marriage. Michael stated that, if the petition was granted, he intended to "initially get [a two-bedroom] apartment and then, possibly, look for a house to rent or maybe purchase." He had checked into the local Georgia school systems and found them comparable to District 204.

According to Michael, he had a good relationship with Kathryn. He described it as a friendship, rather than a parent-child relationship. They often went to the movies, ate at restaurants, and played computer games. Michael stated that he would not interfere with respondent's relationship with Kathryn.

## RESPONDENT'S CASE

Michael was called as an adverse witness. He stated that, in the eight years he worked for Merchants, he had been transferred five times, including the transfer to Atlanta. Michael conceded that, besides asking about a Merchants' job in Illinois, he had made no attempt to find any other employment in the Chicago area. He

acknowledged that he had no relatives in Georgia and that he had not seen his children from his first marriage since 1992. Since July 1993, he had seen his 13-year-old son from his second marriage five or six times. Michael was currently making mortgage payments of $1,296 per month on a home he owned with his second wife. When that house was sold, Michael was to assume child-support payments of $850 per month. Car payments for the two cars owned by petitioner and Michael totalled approximately $800 monthly. Michael stated that, prior to his marriage to petitioner, he was aware of the close relationship between respondent and Kathryn.

Petitioner's mother, Lois Tysl, testified that, since petitioner and Kathryn moved to Aurora, she saw the latter once every two weeks. She opined that it was in the best interests of both petitioner and Kathryn to move to Georgia.

Called as an adverse witness, petitioner stated that she did not have any relatives in Georgia. She admitted that respondent had a very good relationship with Kathryn, who stayed overnight at his home about 150 to 160 nights a year. She acknowledged an incident which occurred early on New Year's Day 1995. On that occasion, Kathryn phoned her father to take her from the Aurora apartment.

On cross-examination, petitioner stated that, in regard to the New Year's incident, Kathryn called her father because there were a number of other children sleeping in her room and she felt crowded.

Richard Levine (Richard), respondent's father, testified that respondent had a loving relationship with Kathryn. All three of Richard's children lived "in the area." He opined that Kathryn was close with the rest of respondent's family. In a normal week, Richard saw Kathryn three or four times. On cross-examination, he acknowledged that he occasionally picked Kathryn up from day-care.

Respondent testified that he lived in a two-bedroom house in Wheaton and that he worked in Bensenville for Sugarloaf of Chicago Company (Sugarloaf). He was employed as Sugarloaf's general manager and had a flexible work schedule. His salary was $30,000 annually, with a bonus totalling about $950 a month. Respondent testified that he had always exercised his visitation rights. Respondent stated that Tuesday was the only day of the week on which he did not see Kathryn. On evenings when he did not see Kathryn, respondent normally talked with her on the telephone. Respondent testified that the proposed visitation schedule would substantially reduce his visitation with Kathryn.

Respondent regularly attended Kathryn's school functions, including parent-teacher conferences. On school nights when Kathryn was staying with him, respondent made sure she did her

homework. He was actively involved with her karate classes, attending her practices and tournaments. Respondent also stated that, in the summer, they often went swimming at the Wheaton public pool, rode bikes, and played in his yard. In the evenings, they did a lot of reading together.

A number of documents regarding District 204 and Clayton County school districts were admitted into evidence. Respondent testified that standardized test scores for schools in Clayton County, Georgia, where Kathryn would likely attend school, were demonstrably lower than those for District 204, in which Kathryn was enrolled. He stated that the average Scholastic Aptitude Test (SAT) score for the Clayton County students was 824, well below the national average of 902. In contrast, the average American College Test (ACT) score in the District 204 was 23.3, which, according to respondent, was above the national average of 20.8. Respondent stated that different regions of the country rely on different standardized college entrance examinations. A study comparing the Clayton County schools with District 204 indicated that the latter ranked higher in 13 categories, while the former ranked higher in 6 categories. In one category, the scores were the same.

According to respondent, Kathryn was upset at the prospect of moving to Georgia. Further, respondent conceded that he owed $1,580 in child support and agreed to pay it. He denied dating a girlfriend, Joanna Covello, while he was living in his Wheaton residence with petitioner and Kathryn. Respondent was unsure how many Atlanta-Chicago round trips for Kathryn he could afford.

On June 16, 1995, the trial court's order was entered. It stated, *inter alia*, that the custodial parent's husband's employment motivated the petition; that it would be unreasonable to require Michael to make other employment arrangements; that petitioner's move to Georgia was not intended to frustrate respondent's visitation rights; that Kathryn's quality of life would be enhanced by going to Georgia with petitioner; and that Kathryn's schooling opportunities in Georgia are comparable to those available in Du Page County.

■ Initially, we note that, pursuant to this court's decision in *In re Parentage of R.M.F.*, 275 Ill. App. 3d 43 (1995), we will apply section 602 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602 (West 1994)) in determining the propriety of the trial court's decision to grant the petition. Section 602 reads in relevant part:

> "(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person;

(7) the occurrence of ongoing abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986, whether directed against the child or directed against another person; and

(8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." 750 ILCS 5/602(a) (West 1994).

As section 602 does not deal directly with petitions for removal, we will seek guidance from cases decided under section 609 of the Act, which addresses such petitions.

It is axiomatic that the trial court's decision is not to be disturbed unless it is against the manifest weight of the evidence. *In re Marriage of Davis*, 229 Ill. App. 3d 653, 660 (1992). Nevertheless, the trial court's broad discretion in these cases is not unlimited and, when the decision is against the manifest weight of the evidence, it will be reversed. *Davis*, 229 Ill. App. 3d at 660-61. We initially note that the record indicates that there was no court-ordered psychological evaluation of the parties and Kathryn. Moreover, prior to the hearing on the petition, respondent made a motion for the trial court to conduct an *in camera* interview with Kathryn. Petitioner objected to the motion, citing Kathryn's age (eight). The trial court reserved its ruling and stated:

"I'd like to hear testimony on the case, if this [petition], in fact, is contested. And then, at some point in time, I can make a determination of would this be helpful in hearing the child."

The record indicates that no ruling was made on the motion. The record also indicates that Kathryn was a bright child, who was capable of articulating her concerns. Thus, the trial court reached its decision regarding Kathryn's best interest without the benefit of two measures often used in that determination.

In regard to the above-cited statute, a number of the factors are undisputed or have no relevance to the instant case. Regarding the wishes of the parties as to Kathryn's custody (factor 1), it is obvious that petitioner thinks it is in Kathryn's best interest to live in Georgia with her, while respondent thinks that it would behoove Kathryn to stay in Illinois. Regarding Kathryn's wishes as to her custodian (factor 2), there is no evidence. However, it is apparent that Kathryn did not want to move to Georgia.

Factors (5) through (7) have little relevance here. There is no indication that petitioner, respondent, or Kathryn has had any mental or physical problem which would bear on this case (factor 5). Further, there is no indication of any physical violence or abuse (factors 6 and 7). Finally, the testimony of the parties indicated that both parents willingly encouraged Kathryn's close and continuing relationship with the other parent (factor 8).

■ We thus turn our attention to the remaining factors, namely, (3) the interaction and interrelationship of Kathryn with her parents and their families; and (4) Kathryn's adjustment to her home, school and community. As the *R.M.F.* court stated, these factors relate to "the effect of any change in custody or visitation on the child's overall quality of life." *R.M.F.*, 275 Ill. App. 3d at 51.

Respondent argues that there was no evidence to show that Kathryn's quality of life would be enhanced by the move to the Atlanta area. In contrast, petitioner maintains that the evidence clearly supported the trial court's granting of the petition for removal.

A decision as to the best interest of the child must be made on the factual circumstances of each case, not on the basis of a bright-line test. *In re Marriage of Berk*, 215 Ill. App. 3d 459, 463 (1991). The facts before us demonstrate a far greater involvement of the respondent than is typical in removal cases. The undisputed testimony showed that respondent saw Kathryn six days a week and that she stayed over at his house between 150 and 160 nights a year. *Cf. R.M.F.*, 275 Ill. App. 3d 43 (the objecting father had visitation with the minor child every other weekend); *Berk*, 215 Ill. App. 3d at 467 (the objecting father's visitation with the minor children was 71 days a year). On evenings when Kathryn was not staying with him, respondent would talk with her on the telephone. The undisputed evidence also shows that respondent was directly involved in Kathryn's schooling and her other activities, including karate classes and competitions. Respondent attended parent-teacher conferences and made certain that Kathryn was keeping up with her homework. He purposely held a job which allowed him the flexibility to see his daughter on an almost daily basis.

While we are cognizant of the fact that petitioner was the custodial parent, we nevertheless find this situation to be one in which the parties are virtually co-parents, with each devoting a similar amount of time and energy to the raising of their daughter.

The testimony further demonstrated that Kathryn had extensive interaction with respondent's extended family and regularly saw her maternal grandparents. Conversely, neither petitioner nor Michael had any relatives in Georgia. Petitioner contends that the fact that the move would possibly lessen Kathryn's contacts with her extended family, when standing alone, is not determinative. *In re Marriage of Pfeiffer*, 237 Ill. App. 3d 510, 514 (1992). However, we find that this is a situation in which this factor does not stand alone. Accordingly, we do not find *Pfeiffer* to be persuasive authority.

The evidence comparing District 204 with the schools of Clayton County was not conclusive. However, it is undisputed that the average SAT scores of Clayton County schools were well below the national average. Conversely, District 204 scores on the ACT examination were well above the national and state averages. Such evidence suggests that, at best, a move from District 204 schools to a Clayton County school system would be neutral in its effect upon Kathryn.

Moreover, the evidence relating to Kathryn's projected lifestyle in the Atlanta area was vague. It was uncertain if or when the family would move from the two-bedroom apartment, which Michael was currently renting. Petitioner's testimony regarding her employment plans was unenlightening. She was unsure whether she would return to work and, if so, whether her return to work would be on a full- or part-time basis.

Additionally, we find no evidence to support the trial court's finding that Michael had no choice but to accept the position in Georgia. Michael stated that, when his Illinois position with Merchants ended, he asked about the possibility of getting another Merchants' job in the area. There is no testimony that he made any attempt to find similar employment with another company in the Chicago metropolitan area. From this evidence, we are not persuaded that Michael's only employment option was to take the Merchants' job in Georgia. *Cf. Pfeiffer*, 237 Ill. App. 3d at 514 (the stepfather testified that only three cities, none of which were in Illinois, provided job opportunities in his field of microbiology).

Regarding a comparison of the parties' financial circumstances, we find that the record is not at all clear as to the impact of Michael's other obligations upon his ability to provide for petitioner and Kathryn. For example, the record indicates that Michael was currently

making mortgage payments of $1,296 on a home he owned jointly with his second wife and that when the house was sold he would begin making child support payments of $850 per month. Assuming, *arguendo*, that Kathryn would experience an increased standard of living with the move to Georgia, this is but one of many factors to be considered. *Berk*, 215 Ill. App. 3d at 467.

Based on this record, we find that petitioner did not carry her burden of proving that the move to Georgia would be in Kathryn's best interest. Instead, the evidence demonstrated that Kathryn's visitation with respondent would decrease by at least 50%. Her interaction with her relatives would also be significantly diminished. Though the quality of Kathryn's life in Georgia might possibly be better in a material sense, it would be diminished in many important ways. Kathryn's best interest is not reflected in the trial court's determination, which we find to be against the manifest weight of the evidence.

■ We note that, in explaining its decision, the trial court stated in pertinent part:

> "If [petitioner] were forced to make that choice [whether to stay in Illinois with Kathryn or move to Georgia without Kathryn], this can only result in bitterness and resentment on behalf of the [petitioner] which is going to interfere with what has previously been a relationship between the parents of cooperation. *It would create more problems and I think it would be much better off at this point to let her do as she has chosen to do, what she wants to do, which is to go to Georgia and have the child with her.*"
> (Emphasis added.)

We interpret this passage as indicating that the trial court believed it had little choice but to grant the petition because of petitioner's "irrevocable action" of marrying a man who lived and worked in Georgia.

As this court stated in *Berk*:

> "Custodial parents and their spouses must remember that they do not make decisions in a vacuum. Decisions must be made in an environment in which the best interests of the children are paramount. This State's courts are in place to protect the children's interests and will not be intimidated or threatened by 'irrevocable' actions of parents. ***
>
> *** It is virtually impossible to envision a situation wherein the custodial parent does not wish to live with a new spouse. If the obvious happiness the spouse would receive from being able to live with a new spouse were sufficient to prove removal in the child's best interests, court supervision of the proceedings would be unnecessary, and at best, ceremonial. A custodial parent must

prove more than his or her own desire to live with a new spouse to prove that a child's best interests will be served by removal." *Berk*, 215 Ill. App. 3d at 465-66.

We find this case similar to *In re Marriage of Davis*, 229 Ill. App. 3d 653. In *Davis*, the parties divorced in 1989 and the petitioner was initially awarded custody of the three minor children. In 1990, the parties entered into a stipulation, whereby custody of their two sons was transferred to the respondent. The daughter continued to reside with the petitioner. In April 1991, the petitioner filed her petition to remove the daughter to Georgia, where petitioner's fiance was living and working.

At the June 1991 hearing on the removal petition, the evidence demonstrated, *inter alia*, that the petitioner planned to marry in July 1991; that the fiance was unemployed when he went to live with his brother in Georgia; that the fiance's new job in Georgia was better paying than his prior jobs in Decatur, Illinois; that petitioner had looked for work as a licensed practical nurse in Georgia; that petitioner might take a part-time position to spend more time with her daughter; that respondent had a very close relationship with his daughter; that respondent was willing to have the daughter live with him if the petition was denied; that the daughter was close to her siblings and paternal grandmother and had no relatives in Georgia; and that the daughter did not want to move to Georgia.

In granting the petition, the trial court found:

"(1) petitioner intends to remarry; (2) her future husband is employed and lives in Georgia; (3) it is in [the daughter's] best interest to remain in the custody of petitioner; (4) petitioner has substantial employment possibilities in Georgia; and (5) '[t]his is a common problem due to our mobile society and it is a compelling reason for granting the petition.' " *Davis*, 229 Ill. App. 3d at 658.

In reversing the trial court's granting of the petition for removal, the *Davis* court stated:

"*The evidence placed before the trial court by petitioner in support of her desired move really boils down to her desire to move to Georgia to be with her new husband.* As we have stated previously, if this was the only requirement to show the move to be in the best interest of the child, there would have been little reason for the legislature to enact section 609 of the Act. *** Although ours is indeed a mobile society, this fact alone is not, contrary to the findings of the trial court, a compelling reason to grant a custodial parent's petition for removal. *Custodial parents and their spouses do not make decisions in a vacuum. Decisions must be made in an environment in which the best interest of the child is paramount.* [Citation.] Petitioner here did not carry her burden of proof." (Emphasis added.) 229 Ill. App. 3d at 665.

Similarly, the evidence put forward by the instant petitioner boiled down to her desire to live with her new husband in Georgia. In a circumstance where Kathryn's best interest is paramount, such evidence is insufficient to carry petitioner's burden of proof.

For reasons stated above, we reverse the judgment of the circuit court of Du Page County.

Reversed.

McLAREN, P.J., and GEIGER, J., concur.