NO. 4-00-0021

22 November 2000

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In re: the Marriage of ) Appeal from

JAMES F. SHADDLE, ) Circuit Court of

Petitioner-Appellee, ) McLean County

and ) No. 95D473

KRISTINE M. SHADDLE, n/k/a KRISTINE )

M. SCHIFF, ) Honorable

Respondent-Appellant. ) James E. Souk,

) Judge Presiding.

_________________________________________________________________

PRESIDING JUSTICE COOK delivered the opinion of the court:

The marriage of petitioner, James F. Shaddle, and respondent, Kristine M. Shaddle, n/k/a Kristine M. Schiff, was dissolved in February 1996.  The trial court awarded the parties joint legal custody of their daughter, Devon (born in April 1990), with primary physical custody to Kristine.  In June 1997, Kristine filed a petition for leave to remove Devon from the State of Illinois, alleging that she would soon marry Sidney Schiff and move to Florida.  Later that month, Kristine and Sidney were married.  In December 1997, the trial court denied Kristine's motion and she continued to live in Illinois while Sidney resided in Florida.  In May 1998, a son, Michael, was born to Kristine and Sidney.  In December 1998, Kristine filed a second removal petition, and in the early summer of 1999, while that motion was pending, Kristine moved to Florida, leaving Devon in James' care.  In August 1999, following a hearing, the court denied Kristine's second removal petition.  Kristine appeals.  We reverse.  

The court found that "the mother is an excellent parent."  The court found that Devon was neutral on the move, "as long as she could continue to have substantial contact *** with both parents and the contact with her little brother."  The court was critical of the fact that after the initial motion was filed, "[t]he mother, Ms. Schiff, however did not wait for that matter to be resolved but rather made the choice to go ahead and marry Mr. Schiff on June the 20
th, 1997.  And events have gone from that point."  The court recognized the argument that "the best thing for this child is to be in the full-time care of mom who is a stay-at-home mom and who has always been with the child."  However, there was more to this case.  "The court is really being told, if this is not done my way, then the court will be respon

sible for not acting in the best interest of the child by not keeping the full-time mom situation.  When, in fact, that would have occurred by the unilateral decision of the mother."  The court saw "a somewhat disturbing pattern there of filing a removal petition and without you waiting for court determinations and then taking action, personal choices of her own which, of course, she has a perfect right to make, that then presumably put the court in a position where somehow its hands are tied."  "Ms. Schiff knew before she got married that she was treading into dangerous, difficult waters that might create a problem."  "That whole process *** does not indicate a decision I believe that placed Devon first."  

The court determined "that while there may have been some efforts to seek out jobs in Illinois, that the effort was reasonably superficial."  The court noted, however, that it did not "casually suggest that people take $50,000 pay cuts."  

The court recognized that Devon had a good relationship with her father.  "The move to Florida in my view would substan

tially alter the relationship between Devon and her father."  "The relationship that this man has with his daughter is--and the involvement in her life[,] especially considering the work schedule that he has and travel[--]is exceptional."  The court also noted that Devon had a very close relationship with her grandmother and her aunt.  

The court was troubled by allegations made against Sidney Schiff in a prior divorce, while recognizing "we are not here today to determine the truth of what happened in Mr. Schiff's prior household or his prior divorce."  The court was troubled that Schiff agreed to an order "that there be no contact with his child until progress is made or whatever."  The court did note the "evidence presented by Devon that she likes Sid, and he is a good guy, and never been any indication from her of any problems in the home in any way, shape[,] or form."  Still, the allegation "leaves uncertainty in which there is almost no way to alleviate perhaps until at least the court in New Jersey has removed that restriction."  In contrast, "in terms of the care received from her father and his side of the family, there are no unknowns, there are no risks.  There are no uncertainties."  Nevertheless, "I really haven't any conclusions about what happened in New Jersey, and I have some recognition that it could all be one of those types of situations where one parent does eliminate the other."  

The court concluded that "the choices that Mrs. Schiff has made has, in fact, led to hoisting herself upon her own petard and putting herself in a situation where the best inter

ests of this child are not being served, and court believes that this second petition to remove should also be denied."  The court also found that "the relationship of the father with this daughter is of such remarkable depth, and I feel that's an overriding factor in this case."  

The trial court noted that the first removal petition was denied in December 1997, and "the court here has to determine whether there has been any substantial change since that time."  If the court considered, in isolation, only the events occurring after the denial of the first petition, the court erred.  At the second hearing, the court should have considered all facts bearing on the removal issue, whether or not those facts were in existence and were considered when the first petition was denied.  The question before the trial court was not whether the evidence presented at the first hearing was insufficient to justify removal, and whether the evidence at the second hearing was insufficient to justify removal.  The question before the trial court was whether all the evidence, considered 
in
 
toto
, was sufficient to justify removal.  The party opposing removal should not gain an advantage from the fact that the evidence is taken at two hearings instead of one.  

Where continuing relief is involved, such as in cases involving child support or custody, a modification may be appro

priate where there is a later material change of conditions.  A modification claim "may arise upon the later facts (to be considered sometimes in combination with the old), and that claim will be held not barred by the previous judgment."  Restatement (Second) of Judgments §13, Comment 
c
, at 133 (1982).  "Where important human values *** are at stake, even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought."  Restatement (Second) of Judgments §24, Comment 
f
, at 203 (1982).  A determination by the court that the plaintiff has no enforceable claim because the action is premature is not a determination that he may not have an enforce

able claim thereafter, and it does not normally preclude him from maintaining an action when the claim has become enforceable.  Restatement (Second) of Judgments §20, Comment 
k
, at 175 (1982).

A more limited rule is provided by section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/610(b) (West 1998)).  Section 610(b) prevents a court from modifying a prior custody judgment except "upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment."  750 ILCS 5/610(b) (West 1998).  Section 610(b) represents a compromise between the stability of custody judgments and the welfare of the child, which may be harmed if the court refuses to consider facts available earlier.  

An order denying a petition for leave to remove is not a "custody judgment" as that phrase is used in section 610(b).  An order denying a petition for leave to remove is not similar to an award of custody, where stability is all important.  See 
In re Marriage of Wycoff
, 266 Ill. App. 3d 408, 409-10, 639 N.E.2d 897, 900 (1994); 
In re Custody of Harne
, 77 Ill. 2d 414, 420, 396 N.E.2d 499, 501-02 (1979) ("[I]nsuring the decree's finality is more important than determining which parent should be the custodian").  Parties are encouraged to file petitions for leave to remove as soon as possible, even before all the facts have been developed.  The trial court should have considered all relevant evidence in deciding the second petition to remove, including evidence presented on the first petition.  

When the trial court stated that Kristine was hoisted upon her own petard, it relied upon a line of cases from the Second District.  See 
Tysl v. Levine
, 278 Ill. App. 3d 431, 440, 662 N.E.2d 915, 921-22 (1996); 
In re Marriage of Berk
, 215 Ill. App. 3d 459, 465, 574 N.E.2d 1364, 1368 (1991).

"The only reason that a change of cus

tody would occur in this case is because Karen has made an 'irrevocable commitment' to move, even though the court determined that the move was not in the best interests of the children.  Karen, in her own brief, argues that the decision was made to move even if the children could not come with her.  Custo

dial parents and their spouses must remember that they do not make decisions in a vacuum.  Decisions must be made in an environment in which the best interests of the children are paramount.  This State's courts are in place to protect the children's interests and will not be intimidated or threatened by 'irrevo

cable' actions of parents.  Karen has made her decision to move to Humboldt.  She must now live with the consequences of that deci

sion.  The presumption of section 610 *** [in favor of continuing existing custodial rela

tionships] is not applicable here."  
Berk
, 215 Ill. App. 3d at 465, 574 N.E.2d at 1368.  

This court, however, has rejected much of that reason

ing.  We disagree with any implication that a noncustodial parent is free to marry whomever he or she wants to, but a custodial parent is not.  
In re Marriage of Eaton
, 269 Ill. App. 3d 507, 517, 646 N.E.2d 635, 643 (1995); 
In re Marriage of Deckard
, 246 Ill. App. 3d 427, 434, 615 N.E.2d 1327, 1333 (1993).  The trial court cannot order a custodial parent to remain in the state, nor can the trial court hold it against her if she legitimately decides to leave.  Where the custodian will choose to leave the state without the children if the petition for removal is denied, a trial court that does not consider whether, 
e.g.
, the children are better off out of state with the custodian or in state with the noncustodian, is ignoring reality.  
In re Marriage of Creedon
, 245 Ill. App. 3d 531, 536, 615 N.E.2d 19, 23 (1993).  An ex-wife who chooses to remarry and move out of state cannot be criticized for that decision, in the absence of any showing that she did so in an attempt to frustrate visitation or interfere with the relationship between the ex-husband and the child.  
Wycoff
, 266 Ill. App. 3d at 416-17, 639 N.E.2d at 904.  The importance of stability in custody judgments is recognized by the law.  It is illogical for a court to protect a father's visita

tion rights by taking primary physical custody away from the mother.  
Wycoff
, 266 Ill. App. 3d at 416, 639 N.E.2d at 904.  

The supreme court has identified five factors that should be considered in determining whether removal is in the best interests of the child sought to be removed.  Those factors are (1) whether the proposed move will enhance the quality of life for both the custodial parent and the children; (2) whether the proposed move is a ruse designed to frustrate or defeat the noncustodial parent's visitation; (3) the motives of the noncustodial parent in resisting removal; (4) the visitation rights of the noncustodial parent; and (5) whether a reasonable visitation schedule can be worked out.  
In re Marriage of Eckert
, 119 Ill. 2d 316, 326-27, 518 N.E.2d 1041, 1045-46 (1988).  The trial court's decision is not to be disturbed unless it is clear that its decision was against the manifest weight of the evi

dence.  Although the trial court has broad discretion in these cases, that discretion is not unlimited, and when the decision is against the manifest weight of the evidence, it will be reversed.  
In re Marriage of Ludwinski
, 312 Ill. App. 3d 495, 498, 727 N.E.2d 419, 422 (2000).

The first 
Eckert
 factor is the quality of life for both the custodial parent and the child.  If Devon were to live in Florida, she would live in a household with two parents and her half-brother, in a more-or-less traditional family.  If Devon lived in Illinois, things would be somewhat different.  James is employed and does travel frequently.  Dr. Theodore Matthews, a clinical psychologist, testified that it would be best for Devon to remain primarily in Kristine's care.  Other aspects of the move do not favor either party.  Devon has an excellent relation

ship with her father, but she has a similar relationship with her mother.  If Devon remains in Illinois, she will be able to maintain her relationship with her grandmother and her aunt; but if she moves to Florida, she will be able to have a relationship with her brother.  The move to Florida will significantly affect the general quality of life for Kristine, the custodial parent, and that indirect benefit should be considered.  
Ludwinski
, 312 Ill. App. 3d at 499, 727 N.E.2d at 423.

Sidney testified he was employed as a nursing home administrator in Florida and was responsible for a 180-bed nursing home.  He had sought employment in Illinois, but had not received any job offers, and the Illinois salary range for his employment was some $50,000 to $55,000 below the range in Florida.  Neither the statute, nor 
Eckert
, requires that the custodial parent or her intended spouse exhaust all employment opportunities in Illinois prior to seeking employment out of state, at least when there is no argument that the motives of the parent seeking removal are suspect.  
Ludwinski
, 312 Ill. App. 3d at 500-01, 727 N.E.2d at 424.  Custodial parents should not be expected to give up careers for the sake of remaining in the same geographic location.  
In re Marriage of Good
, 208 Ill. App. 3d 775, 778, 566 N.E.2d 1001, 1003 (1991).  That is even more true of the spouses of custodial parents.  

The second 
Eckert
 factor is whether the proposed move is a ruse, designed to defeat the noncustodial parent's right to visitation.  There is no evidence of that in this case.  There are legitimate reasons why Kristine should live in Florida.  Her husband lives there, and she has a home there.  Her child lives there.  Likewise, there is no indication that James' motives in resisting removal are anything but appropriate.  

The fourth and fifth 
Eckert
 factors deal with the visitation rights of the noncustodian parent and whether a reasonable visitation schedule can be achieved if the move is allowed.  It will not be any more difficult for Devon to visit James from Florida than it would be for Devon to visit Kristine from Illinois.  In all cases, removal will have some effect on visitation, but the real question is whether a schedule can be created that is both reasonable and realistic.  It need not be perfect.  
Eaton
, 269 Ill. App. 3d at 515, 646 N.E.2d at 642.

We have reviewed the depositions that were taken during Sidney Schiff's prior divorce.  There is no doubt that Sidney's son is bitter over that divorce and angry with his father.  Sidney has attempted to contact the son and has written him letters and cards, but the son does not want to see him.  The son related incidents where Sidney struck him after the son made inappropriate remarks.  The son related incidents where Sidney told him, after he got in trouble, that he was never going to be any good and was going to end up in jail.  The son stated that Sidney thought he could heal people with his hands and talked about spirits in the house where they lived.  The trial court appropriately gave this evidence little weight.  It would have been improper for the trial court to deny the petition for removal simply to eliminate any possibility that Sidney might harm Devon, of which there was no evidence.  Denial of the petition itself carries significant costs.  See 
In re N.S.
, 255 Ill. App. 3d 768, 780, 627 N.E.2d 1178, 1186 (1994) (Cook, J., dissenting) (rejecting argument that "the safest approach is to change custody whenever an accusation is made, regardless of the quality of the proof").  

As in 
Ludwinski
 and in 
Wycoff
, on balance, the inter

ests of the custodian should not be subordinated to those of the noncustodian in this case.  When the suggestion that the mother caused all these problems by her unilateral decision to marry someone from out of state is eliminated from the case, all the remaining factors either favor the mother or do not favor either party.  We find that the denial of the petition to remove was against the manifest weight of the evidence.  We reverse the judgment and grant the petition to remove.  We remand to the trial court for the purpose of arranging a smooth transition for the return of Devon to Kristine's custody and for the purpose of setting a visitation schedule.

Reversed; cause remanded with directions.

MYERSCOUGH, J., concurs.

STEIGMANN, J., dissents.

JUSTICE STEIGMANN, dissenting:

Cases involving child custody and removal of a child out of state by the child's custodian are among the most diffi

cult for trial courts to resolve, requiring Solomon-like wisdom.  The difficulty is magnified when the competing parents are good people who both have a strong relationship with their child and have appropriately shown their love and concern for that child.  That situation is essentially the one before us in this appeal, and our deference as a reviewing court to both the trial court's findings of fact and exercise of discretion should never be higher.  Despite the deference due the trial court, the majority here second-guesses that court's carefully considered judgment and reverses.  I respectfully dissent.

I. JAMES' INVOLVEMENT WITH HIS DAUGHTER

The majority states that "[w]hen the suggestion that the mother caused all these problems by her unilateral decision to marry someone from out of state is eliminated from the case, all the remaining factors either favor the mother or do not favor either party."  Slip op. at 11-12.  This statement is inaccurate and a distortion of the record.  

James is the owner and chief executive officer of his own company, Metagenics Midwest, Inc., which wholesales food supplements to physicians.  His 1997 tax return lists his gross wages as $149,999.  

James testified that under their original custody arrangement, he picked Devon up at school every Thursday so that they could have dinner together and attend church that evening.  Devon then spent the night at James' house, and he took her to school on Friday morning.  Every other weekend, James kept Devon from Thursday through Sunday.  On those weekends, they also attended religious services on Sundays.  Although James did not attend some of the school functions that took place during business hours, he frequently had lunch with Devon and her classmates at school and spoke to Devon's teacher regularly.  He also takes Devon to her doctor and dental appointments.

Although James needed to travel for business reasons in the past, he stated that he would arrange to travel less if Kristine's removal motion was denied.  He was in the process of hiring an assistant who could assume those responsibilities.  James had already purchased a residential lot in Devon's current school district so that if he was to become primary custodian, Devon would not have to switch schools. 

Devon has a close relationship with James' mother, Joy Shaddle, who lives about an hour from James' house.  She is also close to James' sister, Kathleen Carlson, who lives in Chicago.  Joy and Kathleen both testified about their relationships with Devon and the various activities they enjoy with her. 

Dr. Theodore Matthews, a clinical psychologist, testi

fied that Devon's interests would be best served if she could have access to both parents.  If that was impossible, it would be best for her to remain primarily in Kristine's care.  According to Matthews, Devon had minimized the significance of the move in her own mind and its impact on her relationship with James.  She was under the impression that she would spend time with him every other weekend. 

The trial court found that the relationship between James and Devon was one of "remarkable depth" and noted that the preservation of this relationship was the overriding factor in its decision.  The court's finding was warranted.  The record shows that James assiduously exercised his visitation rights and made an extraordinary effort to develop and maintain a meaningful bond with Devon.  The court was therefore justified in concluding that James and Devon's relationship should not be jeopardized to satisfy Kristine's desire to move to Florida.  Moreover, in light of the distance involved, no realistic visitation schedule would enable James to preserve and foster his relationship with Devon.  

II. SIDNEY'S PECULIAR FAMILY HISTORY

Kristine argues on appeal that it was improper for the trial court to consider the evidence related to Sidney's divorce from his first wife.  I disagree, and the majority appears to disagree as well, given that it discusses the depositions that were taken during that divorce.  The circumstances surrounding Sidney's divorce clearly gave the trial court pause, and they should have given the majority pause as well.  Many divorces result in bitterness between the parties, but few result, as did Sidney's, in the total estrangement of a teenage child from the noncustodial parent.  Indeed, in the hundreds of divorces I was involved in as a trial judge, as well as the hundreds I have had occasion to deal with as an appellate judge, I have never before seen the total rejection by a teenage child of the noncustodial parent from that child's life, despite the noncustodial parent's apparent efforts to reestablish some sort of relationship.  Perhaps the son's response is a total overreaction to the inci

dents in which Sidney struck him when he was a younger child, but no one knows that to be the case, certainly not the majority.  

The majority writes that "[i]t would have been improper for the trial court to deny the petition for removal simply to eliminate any possibility that Sidney might harm Devon, of which there was no evidence."  Slip op. at 11.  I emphatically disagree with this statement and believe it the height of naiveté. 

Upon Devon's removal to Florida, Sidney will be, for all practical purposes, one of her parents.  How then could it be improper for the court to consider Sidney's record as a parent in determining whether to grant the removal petition?  Sidney's record as a parent is not good.  The record strongly suggests that he has totally alienated his only son by, among other things, beating him.  In this age of heightened awareness about problems of domestic abuse, the majority is simply wrong to imply that it was unreasonable for the trial court to be concerned about Sidney's parenting ability.  As the stepfather with whom Devon will be living, Sidney's impact on her will be immeasurable--whether positive or negative.  The majority's dismissive approach of the trial court's concerns is reminiscent of the "one-free-slap" rule, the resurrection of which I want no part.  

The issue before the trial court was 
not
 whether Sidney presented an imminent danger to Devon.  Instead, the issue was whether, based on all the circumstances of this case, a reason

able person could conclude that it was in Devon's best interest not to move with Kristine to Florida where she would live with Sidney.  In my judgment, the concerns about Sidney 
by
 
themselves
 are fully sufficient to justify the trial court's determination that Kristine's petition should be denied.

In its ruling, the trial court noted that Sidney had been subjected to an order in his earlier divorce limiting his contact with his son, although the court was not totally aware of the circumstances in which that order was entered.  Nonetheless, in deciding Devon's best interest, the court observed that in contrast to its concerns about Sidney, "in terms of the care received from [James] and his side of the family there are no unknowns, there are no risks.  There are no uncertainties."  In my judgment, this assessment was absolutely correct. 

III. THE TRIAL COURT'S REMARKS REGARDING KRISTINE

A constant theme in the majority's opinion is its desire to "spank" the trial court for its allegedly inappropriate comments about how Kristine made the "unilateral decision" to move to Florida and marry Sidney, even though the court had not approved her request to remove Devon from Illinois.  In con

structing her appellate argument, it appears as though Kristine combed the trial court's ruling for remarks that could be con

strued as evidence of improper considerations.  The majority seems to have done so as well.  The record before us provides ample evidence supporting the court's ruling such that we would have been able to affirm had the court simply ruled, "motion denied."  Courts of review should 
encourage
 trial courts to provide lengthy explanations of their rulings, such as the one the court provided here, and we should be disinclined to parse a court's language explaining its decision in search of some questionable phrase that might be buried in its remarks.