2022 IL App (1st) 220074

No. 1-22-0074

Third Division
September 30, 2022

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| DAVEN R. SCOTT, | ) | Appeal from the Circuit Court |
|  | ) | of Cook County. |
| Petitioner-Appellant, | ) |  |
|  | ) | No. 2020 D 079351 |
| v. | ) |  |
|  | ) | The Honorable |
| AMBER HARITOS, | ) | William Yu, |
|  | ) | Judge Presiding. |
| Respondent-Appellee. | ) |  |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent, Amber Haritos, filed a petition to relocate from Illinois to Tuscaloosa, Alabama with the minor child, age two years, she had with petitioner, Daven R. Scott. The parties never married. After a two-day evidentiary hearing, the trial court granted Amber's petition to relocate. Daven appeals, arguing that the court's order granting relocation was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 2                                                    BACKGROUND

¶ 3          Amber and Daven began dating on or around March 25, 2017. At that time, Amber was a graduate student at the University of Illinois at Springfield. Daven resided in Chicago with his mother but traveled every other weekend to spend time with Amber. After Amber's graduation in 2018, she moved to the Roseland neighborhood of Chicago, where she resided with her family, not Daven. On March 8, 2019, one child, whom we will call A.H.S., was born out of the relationship. Following A.H.S.'s birth, there was no specific parenting plan or maintenance put into place but Daven at times assisted Amber by providing childcare supplies and also engaged in parenting time as permitted by Daven's work schedule, as Daven worked as a property manager at that time. According to Amber, the parties ended their dating relationship in August of 2019, following an incident in which Daven physically abused Amber. After this incident, the parties continued to meet with each other on occasion and communicated regarding their child.

¶ 4          On December 29, 2019, Amber moved with A.H.S. to Tuscaloosa, Alabama. The parties dispute whether Amber sought or received permission from Daven to relocate prior to moving with A.H.S. However, Daven remained in regular contact with both Amber and A.H.S through telephone, text messaging, and video conferencing.

¶ 5          On March 18, 2020, Daven filed a petition for temporary and permanent allocation of parental responsibilities, parenting time, and to establish child support. In his petition, Daven alleged that Amber had prohibited and excluded him from exercising his parental responsibilities since December 29, 2019, by relocating to Tuscaloosa, Alabama. On March 24, 2020, Daven filed a separate motion requesting that the court order Amber and the child to return to Illinois.

¶ 6    On June 10, 2020, Amber filed a petition for a court order that would permit her relocation to Tuscaloosa, Alabama pursuant to section 609 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq*.). In her petition, Amber alleged that relocation was in A.H.S.'s best interests because Tuscaloosa, Alabama is safer than Chicago, has a lower cost of living, and has higher quality schools and activities for children. Around this same time, in June of 2020, Daven also moved 122 miles away from Chicago to Champaign, Illinois to begin employment with the Housing Authority of Champaign County. Daven did not inform Amber or the trial court of his move from Chicago prior to the court's ruling on his motion to return A.H.S. to Illinois.

¶ 7    On September 16, 2020, the trial court issued an order instructing Amber to return to Illinois with A.H.S. within seven days. Amber complied with the trial court's order and relocated with A.H.S back to her family's residence in the Roseland neighborhood of Chicago, where she remained through the evidentiary hearing. On September 18, 2020, the trial court appointed a guardian *ad litem* to represent A.H.S.'s interests in the pending proceedings on Daven's March 18, 2020, petition for allocation of parental responsibilities and parenting time and Amber's June 10, 2020, petition to relocate.

¶ 8    On October 28, 2020, the guardian *ad litem* submitted her report to the trial court. On January 19, 2021, the guardian *ad litem* submitted her supplemental report to the trial court. However, neither of the guardian *ad litem's* reports are included in the record on appeal.

¶ 9    On June 9, 2021, Amber filed an amended petition to relocate with A.H.S. to Tuscaloosa, Alabama. In her amended petition, Amber again alleged that it was in A.H.S.'s best interest to relocate due to the increased opportunities and quality of life available to Amber and A.H.S. in Tuscaloosa, Alabama. Her amended petition further alleged that Daven had committed fraud

on the court by failing to inform the trial court that he had moved from Chicago to Champaign prior to the trial court's order instructing Amber and A.H.S. to return to Illinois. Amber further alleged that she had received an offer of employment in Tuscaloosa, Alabama that would increase her annual earnings from $31,200 to $52,000, and that she had previously sought employment in Chicago but had not received any offers. Finally, Amber's petition detailed two instances of physical abuse by Daven against her.

¶ 10    On August 9 and 10, 2021, the trial court held an evidentiary hearing on Daven's March 18, 2020, petition for allocation of parental responsibilities and parenting time and Amber's June 9, 2021, amended petition to relocate, at which the following relevant testimony and evidence was presented.

¶ 11    Amber testified that on the date of the hearing, she was 29 years old and residing in the Roseland neighborhood of Chicago with A.H.S, who was then two years old. Amber and A.H.S. shared the residence with Amber's grandfather and Amber's mother. According to Amber, the Roseland neighborhood has a well-documented high rate of crime, violence, and poverty. Amber testified that she had concerns for her safety and A.H.S.'s safety while living in the city of Chicago.

¶ 12    Amber obtained a bachelor's degree in agriculture and animal ecology from Iowa State University and a master's degree in public administration from the University of Illinois at Springfield. When Amber returned to Chicago after graduate school in May of 2018, she was unemployed but seeking employment. On or about July 9, 2018, she learned she was pregnant by Daven. Amber testified that prior to giving birth, her relationship with Daven was "shaky," and that she had endured "physical, emotional, [and] mental abuse." Due to medical issues arising from her pregnancy, Amber remained unemployed during her pregnancy.

¶ 13        Daven was present when A.H.S. was born on March 8, 2019, and Amber and Daven remained in a dating relationship. However, due to financial constraints they continued to live separately with their respective families.

¶ 14        Amber testified that by the end August of 2019, the relationship had "hit a dead end." She further testified to an incident of abuse by Daven that occurred on August 29, 2019. She testified that the dispute leading to the altercation was an argument regarding Daven's mother smoking cigarettes in the presence of A.H.S. Amber testified that Daven struck her, resulting in bruising to various parts of her body. Amber's aunt heard a commotion and came into the room, where Amber was in the corner on the floor with Daven on top of her. Amber's aunt pulled Daven off of Amber. The resulting bruising was documented in photographs that the trial court admitted into evidence, however those photographs are not included in the record on appeal. Amber did not call the police regarding this incident because she was afraid to do so, both because of threats from Daven and also because she did not want Daven to go to jail. Amber testified that after she and Daven broke up in August of 2019, the pair continued to engage in family activities with one another despite Amber's allegation of abuse, because Amber felt it was important to have both parents involved in A.H.S.'s life.

¶ 15        The trial court also admitted into evidence a November 10, 2019, letter from Daven to Amber in which he apologized to Amber for, among other things, putting Amber through "a lot of humiliation, physical abuse, verbal abuse, and mentally [sic] abuse."

¶ 16        In October of 2019, Amber's father, who resides in Tuscaloosa, Alabama, proposed that she and A.H.S. travel to Tuscaloosa to explore whether living there would be a good fit for herself and A.H.S. At this time, Amber's brother already lived with her father in Tuscaloosa. Amber traveled with A.H.S. to Tuscaloosa on December 29, 2019. According to Amber, she

advised Daven of her plan to travel to Tuscaloosa on a temporary basis that may become permanent. Amber testified that her father's residence in Tuscaloosa is about 1500 square feet, has three bedrooms, and a fenced-in yard. She believes the community is safe. Amber testified that after moving to Alabama, she and Daven remained in regular contact by telephone, text messaging, and video conferencing so that Daven could interact with A.H.S. Amber testified that she invited Daven to come visit Alabama, but that he did not. Daven occasionally sent Amber payments of $100 to $200 dollars while Amber and A.H.S. resided there.

¶ 17    In February of 2020, Amber had a telephone conversation with Daven in which she told him that she wished to remain living in Alabama permanently due to her belief that living there would improve the opportunities available and quality of life for her and A.H.S. According to Amber, Daven did not express an objection to Amber's relocation at that time. Thereafter, the parties continued to remain in regular contact regarding A.H.S., and Amber and A.H.S. returned to Chicago for A.H.S.'s first birthday in March of 2020 at Daven's request.

¶ 18    Amber testified that during this visit, on or around March 9, 2020, Daven became angry following Amber's refusal of Daven's attempt to resume a romantic relationship with her. According to Amber, Daven became angry and "tried to hold [her] in the laundry room," resulting in Amber's aunt coming into the room to intervene and separate Daven from Amber. Amber returned to Alabama with A.H.S. the following day.

¶ 19    Regarding her employment opportunities, Amber testified that she applied for a job with Mercedes-Benz in Tuscaloosa, Alabama in February of 2020. She applied for the position through a third-party called the Onin Group. However, Amber did not receive an offer letter from the Onin Group until October 27, 2020, at which point she was residing in Chicago pursuant to the court's order to return to Illinois. Therefore, beginning on or around June 1,

2020, while still residing in Tuscaloosa, Amber began fulltime employment with a company called Teletech as a claims processing agent for Bank of America. At the time of the hearing, she earned $15.00 per hour, or approximately $31,200 annually through Teletech. Amber testified that Teletech did not permit overtime work and that her efforts to advance within Teletech had been unsuccessful up to the date of the hearing. However, her employment with Teletech was exclusively remote during the COVID-19 pandemic, which allowed her to care for A.H.S. throughout the day while working. This also allowed her to continue working for Teletech after she was ordered to return to Chicago in September of 2020.

¶ 20    Amber testified that on October 27, 2020, she received an offer letter from the Onin Group to work for Mercedes-Benz as a national buyer within the procurement services department in Tuscaloosa, Alabama. Amber was offered employment that would have paid her $25.00 per hour, plus overtime, or approximately $52,000 annually. Amber testified that the offer letter described other benefits including a 401(k)-matching program, 3.4 hours of paid time off for every 80-hour pay period, or ten days per year, and 11 guaranteed paid holidays per year in addition to two weeklong plant shutdowns per year. Amber further testified that Mercedes-Benz offered onsite daycare and summer camp. However, as noted, according to Amber, she was not able to accept the offer because she was residing in Chicago pending resolution of her petition to relocate. Amber testified that she remained in contact with the manager of the procurement department, and that a position was still available to her at Mercedes-Benz at the time of the hearing.

¶ 21    Regarding her attempts to locate employment in Chicago, Amber testified that she had applied for more than 200 positions, and that although she had interviews for some, they did not result in employment offers.

¶ 22          Finally, Amber testified that she believes Daven plays an important role in A.H.S.'s life and that she would continue to try to foster the relationship between them including by paying for three roundtrip transportations to Chicago for A.H.S. annually and by agreeing to a reasonable parenting plan.

¶ 23          Daven testified that he was 31 years old. He was born and raised in Chicago, and prior to moving to Champaign in June of 2020, he resided at his mother's home approximately a ten-minute drive from where Amber lived with A.H.S. He testified that between A.H.S.'s birth in March of 2019 and the date of the hearing, he had three jobs, first as a property manager for Senior Suites of Chatham, next for the United States Postal Service, and finally for the Housing Authority of Champaign County. He left his employment at the Postal Service due to a work-related injury for which he also received temporary disability pay for a period. Through his employment at the Housing Authority of Champaign County, he earned approximately $45,800 annually. Daven testified that before moving to Champaign, he sought employment in Chicago but did not obtain any offers.

¶ 24          Daven testified that while residing in Champaign, he was exercising parenting time with A.H.S. every other week from Thursday at 8:00 p.m. until Sunday at 7:00 p.m. Daven further testified that he was not seeking to be A.H.S.'s primary caregiver because he believes Amber is a good parent. He asked that the court maintain the parenting schedule and holidays in place, and further testified that the only parenting time schedule that worked for him was the parenting schedule then in effect, because he would not be able to provide childcare during the day for A.H.S. if more parenting time was awarded due to his work schedule and A.H.S. might therefore have to stay with his mother in Chicago.

¶ 25  Regarding Amber's December 29, 2019, relocation to Alabama, Daven testified that it was his understanding that Amber and A.H.S. would only be gone for two weeks. He did not realize that she planned to relocate permanently until they had a telephone conversation sometime later, at which point Daven objected and began looking for an attorney. He testified that Amber never informed him of any job offer from Mercedes-Benz in Tuscaloosa.

¶ 26  Daven further testified that he loves his child and enjoys spending time with her. He likes to do activities with her, including going to the park, coloring, playing with Play-Doh, and building things using Lego blocks. He testified that he wants to give A.H.S. the best opportunities in life by having both parents in her daily life, and that if permitted, Amber's relocation would deny A.H.S. time with her father, her extended family, and her grandparents. Daven also testified that there are good school systems in Chicago that A.H.S. could attend and where Daven could participate in extracurricular activities with A.H.S.

¶ 27  Lastly, Daven denied Amber's allegations of abuse, but admitted writing the November 10, 2019, letter in which he apologized to Amber for "abuse" at the suggestion of Amber's mother after speaking to his pastor.

¶ 28  The guardian *ad litem* testified that it was her understanding of her appointment in this matter to determine whether it was in A.H.S.'s best interests to relocate to Alabama, and that as part of her investigation she spoke with the parties, certain family members, and individuals at Mercedes-Benz. The guardian *ad litem* testified it was her recommendation that A.H.S. relocate to Alabama. She based that recommendation on Amber's "ability to put A.H.S.'s needs first," while Daven remained inflexible and unwilling to compromise. When asked about Daven's motives for opposing relocation, the guardian *ad litem* testified that while she first believed his opposition was reasonable, through further conversations she began to feel "it was

less about ensuring that there was parenting time [with A.H.S.] and more about controlling [Amber]. Specifically because, *** [Daven] never asked for, and still today is not asking for, and never seemed to ask for any more [parenting time with A.H.S.] than every other weekend," where, in her experience, parents demanding time with their children typically want a more significant amount of time. The guardian *ad litem* further testified that Daven had not been able to provide a plan for parenting logistics when asked. The guardian *ad litem* found that Daven's insistence on maintaining an every-other-weekend parenting time schedule was outweighed by Amber's desire to provide a better quality of life for A.H.S. in Tuscaloosa, Alabama with increased resources from her prospective employment there.

¶ 29    The guardian *ad litem* further testified that she spoke with the manager of the procurement department at Mercedes-Benz and confirmed there were three positions available for Amber. She further testified concerning the details of Amber's offer from Mercedes-Benz. Although the guardian *ad litem* testified that she had notes from her conversations with individuals at Mercedes-Benz, she did not have them with her at the hearing and they were not admitted into evidence.

¶ 30    Finally, the guardian *ad litem* testified that she believes it is important for Daven to be an active parent and that he can be one even if Amber and A.H.S. relocate to Alabama. The guardian *ad litem* indicated that Amber should financially support Daven's efforts to engage in parenting time with A.H.S., and that although it is a 20-hour drive from Chicago to Tuscaloosa, Alabama there are roundtrip flights available for around $120.

¶ 31    At the close of evidence, the trial court requested that both parties submit written proposed findings.

¶ 32     On September 3, 2021, the trial court entered an order granting Amber's June 9, 2021, amended petition to relocate. In the trial court's order, it addressed each of the relocation factors enumerated in the Marriage Act (750 ILCS 5/609.2(g)). First, regarding "The circumstances and reasons for the intended relocation" the trial court found Amber's motives for seeking relocation were genuine and that this factor weighed in favor of granting relocation. The court found Amber was "seeking relocation to provide the best possible life for the minor child," which included "getting away from her Chicago neighborhood which has a high rate of crime, violence, and poverty." The trial court also found Amber credibly testified that "her employment opportunities in Alabama at Mercedes is greater than her current employment with Teletech wherein she earns $15.00 per hour or approximately $31,200 per year" but would be able to immediately increase her salary to $52,000 annually, and receive "eligibility for overtime, significant paid time off and vacation time, onsite curriculum-based childcare, and other benefits including the ability to participate in a 401(k) with a matching program from her employer, and health, dental, and vision insurance," by accepting the offer with Mercedes-Benz in Alabama. The trial court further found Amber credibly testified regarding the safety and educational opportunities available to A.H.S. in Alabama.

¶ 33     The trial court found the second factor, "The reasons, if any, why a parent is objecting to the intended relocation," weighed slightly in favor Amber. Although the court credited Daven's testimony that he has been actively involved in A.H.S.'s life since birth, and that "He wants to continue being a hands-on father who is able to watch and experience his child grow older," the court also found credible the testimony of the guardian *ad litem*, who testified that Daven had been inflexible with many aspects of relocation and appeared to be trying to "control" Amber rather than act in A.H.S.'s best interests. As to this factor, the court also

considered uncontested evidence that Daven himself had relocated away from Chicago to Champaign during the pendency of the relocation litigation.

¶ 34    Regarding the third factor, "The history and quality of each parent's relationship with the child," the trial court found that the evidence supported the conclusion that Amber had been A.H.S.'s primary caregiver since her birth, and also found Daven had consistently exercised his parenting time. However, the trial court found the "evidence does not support that [Daven] desires to be the parent with the majority of parenting time," and cited the guardian *ad litem's* testimony that Daven had not been able to provide a plan for parenting logistics when asked.

¶ 35    As to the fourth and fifth factors, "The educational opportunities for the child at the existing location and at the proposed new location" and "The presence or absence of extended family at the existing location and at the proposed new location," respectively, the trial court found both factors to be neutral. While A.H.S. was too young to be in school at the time of trial, the court found both Tuscaloosa and Chicago offer comparable educational opportunities. The trial court further found that while both Amber and Daven have extended family in Chicago, they both also have extended family out of state, with Amber's father and brother residing in Alabama and Daven's father residing in Indiana.

¶ 36    The court found the sixth factor, "The anticipated impact of the relocation on the child," weighed in favor of relocation. Specifically, the court found:

> "The Respondent's ability to accept the position at Mercedes-Benz would directly benefit the minor child. In addition to earning a substantially greater salary, the Respondent would have significantly more paid time off and greater job flexibility which would provide the Respondent with the ability to spend more quality time with the minor child. The minor child would directly benefit by being placed into the onsite

stem-curriculum-based childcare program at the Respondent's work. Additionally, the minor child would reside in a safer community while still having family support. As the GAL testified, the cost of living in Tuscaloosa, Alabama is significantly more affordable for the Respondent to be able to provide a home in a safe community for herself and the minor child than in Chicago. The minor child would be able to attend an acceptable school once of school age with a diverse group of peers, and the child would be able to enjoy warm weather and outdoor activities year-round."

¶ 37    The trial court also found the seventh factor, "Whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs," weighed in favor of relocation. Here, the trial court found that the parties had been able to work out an allocation schedule when Amber previously lived in Alabama and credited the guardian *ad litem's* testimony that "she researched transportation options and was able to determine that there are reasonably priced flight options to and from Alabama." The trial court also detailed the parenting time schedule Amber proposed, which it deemed reasonable, and noted that Amber offered to pay for three roundtrip flights for A.H.S. to visit Daven in Chicago annually. The court also credited Amber's testimony that she "plans travel to Chicago on additional occasions with the minor child to visit with family and that she would work with [Daven] to coordinate parenting time during any such travel to Chicago."

¶ 38    The trial court did not consider the eighth factor, "The wishes of the child," due to A.H.S.'s young age.

¶ 39    As to the ninth and tenth factors, "Possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child," and "Minimization of the impairment to a parent-child relationship caused

13

by a parent's relocation," respectively, the trial court found these factors weighed in favor of relocation. The trial court found the guardian *ad litem* had proposed a reasonable allocation agreement that would minimize the impairment of Daven's relationship with A.H.S. The court found Amber's desire to foster the relationship between Daven and A.H.S. was credible and would also help to minimize any impairment of Daven's relationship with her, and further found that Amber's increased income from accepting a new position with Mercedes-Benz would increase her ability to allocate resources toward travel between Alabama and Chicago. The trial court also noted that the evidence that Daven had moved to Champaign from Chicago while A.H.S. resided there implied that he did not feel it was necessary to live within the same city as A.H.S.

¶ 40    Finally, regarding the eleventh catch-all factor, "Any other relevant factors bearing on the child's best interests," the trial court found that Daven's "credibility in this matter with respect to what is in the best interests of the minor child is questionable. This is mainly due to his being inflexible with the [Amber's] request to relocate to Alabama even though there are ample factors to support that it would result in a better life for the minor child. Certainly, [Daven's] move to Champaign demonstrates that his reluctance to move outside of Chicago is not entirely sincere." The trial court further found that Daven's denial of abuse of Amber was not credible due to Amber's testimony regarding the abuse and the photographs that corroborated it. The court found that Daven's "efforts to control and force [Amber] to remain living in Chicago under the circumstances are not in the best interest of the minor child of the parties."

¶ 41    On September 8, 2021, Daven filed a timely notice of appeal from the trial court's September 3, 2021, order granting Amber's petition to relocate.

¶ 42                                                    ANALYSIS

¶ 43          On appeal, Daven argues that the trial court's decision to grant Amber's petition to relocate was against the manifest weight of the evidence and must therefore be reversed. Amber responds that Daven has failed to establish that the trial court's decision was clearly, plainly, and indisputably erroneous, and that the trial court's order must accordingly be affirmed. After carefully reviewing both the record and the trial court's order, we find that there is no basis for concluding that the trial court's decision to grant Amber's relocation petition was so "clearly against the manifest weight of the evidence" that "it appears that a manifest injustice has occurred," and therefore affirm the order of the trial court. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 34.

¶ 44          Initially, we note that we have jurisdiction to consider Daven's appeal pursuant to Illinois Supreme Court Rule 304(b)(6) which governs appeals from an order allocating or modifying parental responsibilities pursuant to the Marriage Act (750 ILCS 5/101 *et seq.*) and Rule 311(a), which permits the expedited disposition of an appeal from an order allowing the relocation of an unemancipated minor such as A.H.S.

¶ 45          In adjudicating a relocation petition, a trial court's paramount consideration is the best interests of the child. 750 ILCS 5/609.2(g). In this context, our supreme court has explained that a best interests determination "cannot be reduced to a simple bright-line test" and that a ruling on the best interests of a child "must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *In re Marriage of Eckert*, 119 Ill. 2d 316, 326 (1988). Our supreme court has also cautioned that "[a] trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." *Eckert*, 119 Ill.

2d at 328. "A judgment is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent." *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55. "In determining whether a judgment is contrary to the manifest weight of the evidence, the reviewing court views the evidence in the light most favorable to the appellee. [Citation.] Where the evidence permits multiple reasonable inferences, the reviewing court will accept those inferences that support the court's order. [Citation.]" *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). Such deference is appropriate because " '[t]he trier of fact had significant opportunity to observe both parents and the child and, thus, is able to assess and evaluate their temperaments, personalities, and capabilities.' " *Eckert*, 119 Ill. 2d at 330, (quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31 (1978)). Accordingly, " '[t]he presumption in favor of the result reached by the trial court is always strong and compelling in this type of case.' " *Eckert*, 119 Ill. 2d at 330 (quoting *Gallagher*, 60 Ill. App. 3d at 31-32).

¶ 46 Section 609.2(f) of the Marriage Act applies where, as here, the parties cannot agree to a relocation. 750 ILCS 5/609.2(f). As noted, section 609.2(g) of the Marriage Act sets forth the standards the trial court must use in determining the child's best interests in a relocation request:

"The court shall modify the parenting plan or allocation judgment in accordance with the child's best interests. The court shall consider the following factors:

(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the

16

parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4)   the educational opportunities for the child at the existing location and at the proposed new location;

(5)   the presence or absence of extended family at the existing location and at the proposed new location;

(6)   the anticipated impact of the relocation on the child;

(7)   whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8)   the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9)   possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10)   minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11)   any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g).

¶ 47        Here, as noted, after weighing these factors and detailing in a written order which evidence supported its finding on each factor, the trial court determined that Amber had established by a preponderance of the evidence that relocation was in A.H.S.'s best interests and granted Amber's petition. On appellate review, this court "does not reweigh the competing considerations. Rather, it reviews the trial court's decision deferentially." *In re Marriage of*

*Kavchak*, 2018 IL App (2d) 170852, ¶ 65. Accordingly, we find Daven's reliance on numerous cases in which our appellate courts have affirmed the denial of a petition to relocate to be misplaced. In those cases, the appellate court deferentially reviewed the trial court's treatment of the evidence and balance of the statutory factors and left in place, rather than disturbed, the trial court's decision. The fact that a trial court in a different case, assessing a different set of facts, reached a conclusion with which an appellate court agreed does not mean that a "manifest injustice" has occurred wherever a trial court reaches a contrary conclusion. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 34 ("a trial court's determination of what is in the best interest of the child should not be reversed unless *** it appears a manifest injustice has occurred***.").

¶ 48        Moreover, the three cases cited by Daven in which the appellate court reversed the trial court's grant of a petition to relocate reinforce, rather than undermine, this court's conclusion that a reversal is not appropriate in the case at bar. First, in *In re Marriage of Davis*, the appellate court accepted the trial court's conclusion that the mother's motive in seeking relocation from Illinois to Georgia was to be closer to a man to whom she was engaged that resided there. 229 Ill. App. 3d 653, 661 (1992). There, the mother introduced letters from prospective employers regarding potential employment in Georgia, but the offers were contingent on factors outside of the mother's control, including obtaining a license in the state, and the appellate court further found it was "apparent from [the mother's] testimony that she had not sought employment *** in Illinois." *In re Marriage of Davis*, 229 Ill. App. 3d at 662.

¶ 49        The appellate court also found significant the fact that the mother had failed to provide any evidence of what her earnings might be in Georgia and found that her testimony regarding her job prospects in Georgia cast doubt on her testimony that she would be able to spend more time with her minor daughter there, because her potential new employment would require her

to work full-time, while her current job in Illinois was only part-time. *In re Marriage of Davis*, 229 Ill. App. 3d at 663. Finally, the appellate court considered the testimony of the minor's father, the minor's two brothers, ages thirteen and fourteen, and the minor herself, age six. The appellate court observed that the minor had a close relationship with her father and brothers, none of whom wanted the minor to relocate to Georgia, and the minor herself "indicated in her testimony that she did not want to move." *In re Marriage of Davis*, 229 Ill. App. 3d at 664. Based on the foregoing, the appellate court found "The evidence placed before the trial court by petitioner in support of her desired move really boils down to her desire to move to Georgia to be with her new husband," and found such a desire, standing alone, was insufficient to warrant removal when weighed against the evidence in support of the countervailing factors. *In re Marriage of Davis*, 229 Ill. App. 3d at 665.

¶ 50       By contrast here, the trial court heard testimony from both Amber and the guardian *ad litem* that Amber had an open employment opportunity in Alabama that would earn her over 60% more than her earnings in Illinois that was not contingent on any factors beyond Amber's ability to relocate. Both also testified that Amber had extensively sought employment in Chicago, but like Daven, had not received any offers. Moreover, in the case at bar, A.H.S.'s wishes were a neutral factor due to her age, whereas in *In re Marriage of Davis*, the court found significant the fact that it appeared the minor herself did not wish to relocate. See *In re Marriage of Davis*, 229 Ill. App. 3d at 664. Contrary to Daven's position, the evidence here does not suggest that Amber's desire to relocate "boils down" to a personal desire of Amber's, but rather, as the guardian *ad litem* testified, stems from a desire to enhance A.H.S.'s quality of life by removing her from an unsafe neighborhood and providing her with greater material resources in a lower cost of living environment near family.

¶ 51     Second, in *In re Marriage of Johnson*, the appellate court considered a case in which the evidence adduced at trial established that "the only benefit shown by removal" arose from the mother's "improved marital relationship," where the record demonstrated there would be no change to mother's salary or capacity to engage with the minor upon relocation. 277 Ill. App. 3d 675, 681 (1996). The appellate court found this minimal indirect benefit to the minor child, standing alone, was so far outweighed by the impairment to the father's visitation rights that the trial court's relocation order was "clearly against the manifest weight of the evidence." *In re Marriage of Johnson*, 277 Ill. App. 3d at 683. In support of its conclusion, the appellate court noted that the trial court had granted removal in spite of its recognition that the father had "extraordinary involvement" in the life of his daughter, having spent 90 days with her in six months preceding trial, or about 50% of the time. *In re Marriage of Johnson*, 277 Ill. App. 3d at 682. Indeed, in the case at bar, the guardian *ad litem* testified that she might have provided a different recommendation if Daven had sought or demonstrated a capacity to exercise more parenting time with A.H.S. than three days every two weeks, or roughly 18 days every six months. By Daven's own admission, he did not. Moreover, as noted, the trial court here found Amber's salary would increase upon relocation and that would provide a direct benefit to A.H.S.

¶ 52     Third, in *In re Marriage of Krivi*, the appellate court reversed the trial court's grant of the mother's petition to relocate after finding the trial court's conclusions "regarding petitioner's motivation for removing the children from their home in Mt. Vernon [were] against the manifest weight of the evidence." 283 Ill. App. 3d 772, 776 (1996). There, the trial court found the mother's motivation for relocating was an incident in which the father physically abused the mother. *In re Marriage of Krivi*, 283 Ill. App. 3d at 776. The appellate court found this

finding was unsupported by the evidence, because the mother stayed in the home for five months following the alleged incident of abuse and had in fact testified that she sought relocation to Minnesota because her mother, brother, and sister lived there. *In re Marriage of Krivi*, 283 Ill. App. 3d at 776. Here again, the appellate court found that the mother's desire to move out of state, standing alone, was insufficient to warrant removal where the father had a demonstrated close relationship with his children and there was "no evidence to suggest that [the father's] motives [were] based on anything other than a desire to maintain close contact with his children." *In re Marriage of Krivi*, 283 Ill. App. 3d at 777. By contrast here, the trial court found Amber's motive in seeking relocation was to provide an enhanced quality of life for herself and A.H.S., while Daven's motive in opposing relocation was, at least in part, to control Amber, as demonstrated by his pattern of abuse, his inflexibility, and his own move 122 miles away from Chicago while A.H.S. and Amber resided there at his behest.

¶ 53    Daven's argument on appeal rests principally on his assertion that Amber's testimony and that of the guardian *ad litem* was not credible, while Daven's testimony, in turn, was credible. The trial court disagreed. It is not the role of the appellate court to second-guess the credibility determinations of the finder of fact. See *In re Marriage of Georgiades*, 2021 IL App (2d) 200677, ¶ 5 ("Credibility determinations are within the sole purview of the trier of fact."); *In re Parentage of I.I.*, 2016 IL App (1st) 160071, ¶ 55 ("[W]e will not reweigh [a] credibility determination on appeal."); *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 29 ("We give great deference to the trial court's credibility determinations, and we will not substitute our judgment for that of the trial court."). The trial court set forth extensive findings regarding how A.H.S. would benefit from the move to Alabama based on testimony and evidence it deemed credible.

There is accordingly no basis to conclude that the trial court's September 3, 2021, order granting relocation was against the manifest weight of the evidence.

¶ 54                                    CONCLUSION

¶ 55          For the foregoing reasons, we affirm the decision of the trial court.

¶ 56          Affirmed.

2022 IL App (1st) 1220074

| | |
|---|---|
| **Decisions Under Review:** | Appeal from the Circuit Court of Cook County, No. 2020 D 079351; the Hon. William Yu, Judge, presiding. |
| **Attorneys for Appellant:** | Danielle A. Pinkston of Pinkston Law Group, P.C. of Chicago, for appellant. |
| **Attorneys for Appellee:** | John Kay and Olga Allen of Hurst, Robin & Kay, LLC of Chicago, for appellee. |